UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

|  |  |  |
|---|---|---|
| REBECCA J. KUCH, Individually and on behalf of the Estate of Louis Roger Sheffels, deceased, an on behalf of K.R.S., J.M.S., and G.L.S., Minors; MICHAEL J. PALMQUIST and TESSA PALMQUIST, husband and wife; LOUIS JERALD SHEFFELS, Individually and on behalf of SHEFFELS & SON, a Washington Corporation, and LOIS SHEFFELS, husband and wife, | ) ) ) ) ) ) ) ) ) ) ) ) ) | NO.   CS-03-0355-LRS<br><br>ORDER DENYING MOTION FOR RECONSIDERATION/AMEND JUDGMENT; RULING ON PENDING MOTIONS; DIRECTING ENTRY OF JUDGMENT |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| UNITED STATES OF AMERICA, and the BOEING COMPANY, a Delaware Corporation, and DOES I THROUGH V, Inclusive, | ) ) ) ) ) | |
| Defendants. | ) ) | |

This matter comes before the Court on plaintiffs' motion for reconsideration of this Court's March 2, 2005 oral ruling excluding the post-hypnotic testimony of Michael Palmquist, striking various portions of the Declarations of Jerry Wells, Dr. Donald Kennedy, and Richard Wood, granting defendants motions for summary judgment and denying plaintiffs' motion for partial summary judgment. Having considered the plaintiffs' motion for reconsideration and the defendants' opposition thereto, the Court enters this Order both denying the motion for reconsideration and

ORDER - 1

supplementing the Court's oral ruling on the underlying motions.  This Order is intended to both supplement and memorialize the Court's final ruling on the pending motions in this case.

Reconsideration of a summary judgment ruling under Fed.R.Civ.P. 59(e) is appropriate if the district court: (1) is presented with newly discovered evidence; (2) committed clear error or the initial decision was manifestly unjust; or (3) if there is an intervening change in controlling law. *School District No. 1J, Multnomah County v. ACands, Inc.*, 5 F.3d 1255, 1263 (9th Cir.1993). A Rule 59(e) motion to alter or amend the judgment "cannot be used to raise new arguments which could and should have been raised before judgment was entered."[1] *Havoco of America, Ltd. v. Sumitomo Corp. of America*, 971 F.2d 1332, 1336-37 (7th Cir.1992).

**I. BACKGROUND**

**1. Factual Background**

In 2001, plaintiff, Michael Palmquist, worked for Sheffels & Son farm as a farmhand.  Sheffels & Son owned several airplanes, including a Piper PA-18 ("Super Cub") aircraft.  Mr. Palmquist was the back-seat passenger the Piper aircraft which crashed on May 22, 2001 near Wilbur, Washington.  The pilot, Roger Sheffels, died.  Mr. Palmquist was the sole survivor of the crash and sustained severe head injuries.

On March 24, 2004, Mr. Palmquist was deposed.  He testified that around 7:30 p.m. on May 22, 2001 he and Roger took off in the Piper aircraft and began flying over fields surveying for insect damage to the crops.  They would descend to about 100 feet while flying over a field,

---

[1] Although "judgment" has not been formally entered, the parties appear to agree the same standards of review shall be applied to this case.

ORDER - 2

then climb again to 500 feet or more when making turns or switching from field to field.  It was a nice, sunny, calm day.  Prior to the crash, Mr. Palmquist's last memory was of having made a second pass over one field (section 28) where they had noticed some grasshopper damage. They were heading south/southeast toward the Wilbur airport and the sun was still up.  His next memory was approximately two weeks later of somebody removing his teeth in the hospital and later being transferred from the hospital to the rehab center.  Mr. Palmquist did not remember seeing or perceiving any other aircraft in the sky that day.

After the crash, while in recovery, Palmquist began doing internet research at home and learned about the wake turbulence behind Airforce C-17 aircraft.  Considering this information and his knowledge of the pilot's piloting skills, he decided that a wake turbulence must have caused the crash.  At the same time, the pilot's father, plaintiff Jerry Sheffels, told Mr. Palmquist that he also considered a C-17 as the cause of the crash.  He had previously complained about C-17s flying low over their farm.

This lawsuit was filed against the United States Airforce and Boeing on October 10, 2003 based upon a theory that wake turbulence of a C-17 was the cause of the Piper crash.[2]  At the request of plaintiffs'

---

[2]  The plaintiffs' Amended Complaint alleges against Boeing a products liability claim that the C-17 was unreasonably dangerous and defective for failure to be equipped with an aircraft avoidance system. Also alleged against Boeing is negligence in failing to warn aircrews and the public of the wake turbulence created by the C-17.  Against the USA, the complaint asserts 12 different negligence claims including negligent operation of the C-17, negligent design, failure to properly schedule, failure to supervise, failure to train, failure to warn, failure to test, failure to redesign the C-17, failure to disclose nature of the wake turbulence, and negligent manufacture.

ORDER - 3

attorney, in the summer of 2004, Mr. Palmquist participated in two hypnosis sessions with Thomas McKnight, a Board Certified Clinical Psychologist, trained in hypnosis, for possible enhancement of memory of the circumstances surrounding the May 22, 2001 crash.

Only Dr. McKnight and Mr. Palmquist were present during the sessions. All contacts were videotaped, however the audio on the tape is extremely poor. Dr. McKnight hired a professional audio visual company to transfer the audio from the video to a CD in an attempt to reduce the background noise and improve the clarity of the audio. Both the video and CD are at times inaudible, though the CD is much better.

After the hypnosis sessions, Mr. Palmquist's memory was enhanced. Mr. Palmquist was re-deposed on October 13, 2004. At that time, in addition to what he remembered prior to hypnosis, he could also recollect the following, which he claims are memories refreshed as a result of the hypnosis:

He and Roger were flying over Joel Krause's field. All of a sudden a large plane, which he now recognizes as a C-17, flew across the front of the plane, "fill[ing] up the whole windshield," at a 90 degree angle traveling east to west. He believes they were on a "collision course." Mr. Palmquist also believes the C-17 was maybe a little higher in altitude than they were, as he could see the bottom, lower half of the engine. Then they hit rough air. Roger began "fighting the stick" and saying several things like "hang on, its going to be rough air," or "bad air", and "Hang on. We're going to crash." Then Mr. Palmquist remembers the left wing dipped and the nose dropped at the same time and they "cartwheeled" They began to

come out of the cartwheel and they were right side up. The ground was right in front of them. Roger shut the power off with his left hand. Mr. Palmquist does not recall the impact with the ground, although he recalled being on the ground.

While being questioned by defense counsel, Mr. Palmquist testified as follows:

Q: How do you know that what you remember during the hypnosis sessions are your real memory, what really happened that day, as opposed to something else?

A: I have no idea, but I have been told that you cannot lie when you're in that state.

Q: Is there anything else that you base your belief that the visions you had during hypnosis are an accurate account of the events, other than that you've been told that you can't lie under hypnosis?

A: I believe they are an accurate account.

A: And I remember shaking during the hypnosis.

Q: Okay.

A: Every time we got to that area, I would start trembling.

There were no eyewitnesses to the crash or any encounter between the Piper and another aircraft. There is no radar data, voice recorder data, or flight data recorder from the Piper, or of any military aircraft allegedly in the area. The National Transportation Safety Board investigated the crash and concluded there was no evidence of military aircraft near the Piper when it crashed. Plaintiffs have provided the declarations of two ground witnesses who claim they saw a C-17 in the vicinity of Wilbur on the evening of the crash. Dean Dreger, a farmer and life-long acquaintance of the decedent pilot who came forward during the NTSB investigation, states while outside his home about 1.5 miles south of Wilbur, he saw a C-17 around 8:30 p.m., plus or minus ten minutes. John Laughbon, also a Wilbur area farmer and life-long acquaintance of the decedent, came forward three years after the

ORDER - 5

1  accident.  He states that sometime between 7:30 p.m. and 8:30 p.m. he

2  heard and saw a C-17 fly near his home 3 miles northeast of Wilbur

3  heading west, before it went out of sight behind some hills.  There is

4  no claim by either party that mechanical failure or pilot incapacitation

5  could have caused the crash.  There was no *scheduled* C-17 flight in the

6  area on that day.  The airforce denies any knowledge of a C-17 in the

7  area.

8  **2. The Court's March 2, 2005 Ruling**

9      This matter came before the Court on March 2, 2005 for hearing of the

10  parties cross-motions for summary judgment and several evidentiary

11  motions. The primary issue presented by the motions for summary judgment

12  was the issue of proximate cause: i.e. whether a C-17 was in the vicinity

13  of the Piper aircraft and if so, whether it could have proximately caused

14  the Piper aircraft to crash due to no fault of the Piper pilot.   In

15  denying plaintiffs' motion for partial summary judgment on this limited

16  issue, and granting defendants' motion for summary judgment dismissing

17  the case, the Court excluded evidence proffered by the plaintiff

18  including the post-hypnotic testimony of Michael Palmquist and portions

19  of the plaintiffs' expert declarations based thereon.

20      Plaintiffs claim the Court erred in its application of 9th Circuit law

21  related to hypnotically refreshed testimony in civil cases.  In addition,

22  plaintiffs claim it was error for the Court to deny plaintiffs' counsel

23  the use of a demonstrative exhibit during the oral hearing.

24  **II. POST-HYPNOTIC TESTIMONY WAS PROPERLY EXCLUDED**

25      Judicial acceptance of hypnotically refreshed testimony has been the

26  subject of much discussion and much disagreement.   Though hypnosis has

been accepted as a valid therapeutic modality, it has not been accepted by any scientific body as a valid technique for increasing memory. The reliability of hypnosis as a truth-exacting device is controversial. There are undisputedly many inherent problems with the use of hypnosis to refresh memory.[3]   As summarized by the U.S. Supreme Court in the seminal case of *Rock v. Arkansas*,

> Responses of individuals to hypnosis vary greatly. The popular belief that hypnosis guarantees the accuracy of recall is as yet without established foundation and, in fact, hypnosis often has no effect at all on memory. The most common response to hypnosis, however, appears to be an increase in both correct and incorrect recollections. Three general characteristics of hypnosis may lead to the introduction of inaccurate memories: the subject becomes "suggestible" and may try to please the hypnotist with answers the subject thinks will be met with approval; the subject is likely to "confabulate," that is, to fill in details from the imagination in order to make an answer more coherent and complete; and, the subject experiences "memory hardening," which gives him great confidence in both true and false memories, making effective cross-examination more difficult.

483 U.S. 44, 58-60, 107 S.Ct. 2704, 12712-13, 97 L.Ed.2d 37 (1987)(multiple citations & footnotes omitted).

Courts have generally taken three different approaches to the introduction of testimony which has been hypnotically refreshed.  Some courts say the evidence is automatically admissible, some say its per se inadmissible, and some say it may or may not be admissible depending on whether certain procedural safeguards are met.

The state of Washington, like many other state courts, has taken the per se inadmissible approach, refusing to admit hypnotically refreshed memory into evidence, regardless of the procedures used. *See State v.*

---

[3] For an excellent discussion of the scientific opinions on hypnosis as a method of refreshing recollection, including that of frequently relied upon expert, Dr. Martin Theodore Orne, see *McQueen v. Garrison*, 619 F.Supp. 116 (E.D.NC 1985).

*Martin*, 101 Wash.2d 713, 684 P.2d 651 (1984).  The Ninth Circuit has historically taken a different approach.   The Ninth Circuit's line of cases on this subject developed in the 1970's with *Wyller v. Fairchild Hiller Corporation*, 503 F.2d 506, 509 (9th Cir. 1974) and *Kline v. Ford Motor Company, Inc.*, 523 F.2d 1067, 1069 (9th Cir. 1975).  *Wyller*, like this case, also involved a products liability action arising out of an air crash, where the sole surviving passenger, Wyller, underwent hypnosis some four years after the crash and after he had given his deposition. The purpose was to improve his limited recollection of events surrounding the crash.  The trial court permitted Wyller to testify at trial as to his recollection both prior and subsequent to the hypnosis.  The appeals court, affirming a judgment against the defendant, rejected the defendant's argument that the plaintiff's testimony was rendered inherently untrustworthy by his having undergone hypnosis. Pointing out that the plaintiff had testified from his present "refreshed recollection", the court felt Wyller's credibility and the weight to be given to his testimony were for the jury to determine. The court held that thorough cross-examination would permit the defense to adequately challenge the reliability of both the remembered facts and the hypnosis procedure itself. The court concluded that under the circumstances, it perceived *no abuse of discretion* by the District Court in admitting the testimony.   In *Kline,* the Court similarly found that the risk that a witness' memory may have been impaired by hypnosis or that suggestive material may have been used to refresh his or her recollection is to be considered a matter affecting credibility, not admissibility nor the competence of the witness.   *Kline v. Ford Motor Company*, Inc., 523 F.2d

1067, 1069 (9th Cir. 1975).  Although these cases were civil cases, the Ninth Circuit has applied this same standard to post-hypnotic testimony in criminal contexts.[4] *See U.S. v. Awkard*, 597 F.2d 667 (9th Cir. 1979); *U.S. v. Adams*, 581 F.2d 193 (9th Cir. 1978)(rejecting the constitutional argument that the testimony of a witness who had earlier been subject to hypnosis is unreliable as a matter of law).

While the Ninth Circuit has at no time addressed in detail the scientific and legal debate over the reliability of hypnosis, the Court has noted concern over the procedures used in hypnosis:

> We are concerned, however, that investigatory use of hypnosis on persons who may later be called upon to testify in court carries a

---

[4]    Understanding the vital importance of Mr. Palmquist's post-hypnotic testimony to the survival of the plaintiffs' case, the Court has given this interesting issue very significant thought.  The Ninth Circuit in recent cases has not discussed the scientific reliability of hypnosis and the basic evidentiary precepts established by the Federal Rules of Evidence. *See generally* Paul C. Giannelli, The Admissibility of Hypnotic Evidence in U.S. Courts, 43 INT'L J. CLINICAL & EXPERIMENTAL HYPNOSIS 212 (1995) (explaining that the diversity in case law has resulted from a judicial failure to understand the scientific research on hypnosis).  The *Wyller* and *Kline* position formulated by the Ninth Circuit in the 1970s "depends in considerable part on one's faith in the jury's ability to evaluate the testimony accurately in light of cross-examination, expert testimony relating to hypnosis, and jury instructions."  *Borawick v. Shay*, 68 F.3d 597, 604 (2nd Cir. 1995).  As recognized by various authorities, such an approach "was particularly favored when courts were just beginning to address the admissibility of hypnotically-refreshed testimony,...but it has sparsely been followed since 1980."  *Id.* (citations omitted); *see also McQueen v. Garrison*, 619 F.Supp. 116 (E.D.N.C. 1985)(criticizing the approach in *Wyler* as "unsound" because unlike with a recollection refreshed where a person is able to be critical with what he remembers, a memory refreshed after hypnosis may in fact contain false accounts); Mark Miller, The Unreliability of Testimony from a Witness with Multiple Personality Disorder (MPD): Why Courts Must Acknowledge the Connection Between Hypnosis and MPD and Adopt a "Per Se" Rule of Exclusion for MPD Testimony by Mark Miller, 27 PEPLR 193, at n. 140 (noting these early cases arose before courts viewed hypnotically refreshed testimony with skepticism and questioned its reliability).

1  dangerous potential for abuse.  Great care must be exercised to insure
2  that statements after hypnosis are the product of the subject's own
   recollections rather than of recall tainted by suggestions received
   while under hypnosis.[FN12]
3  ...
   FN12.  We think that, at a minimum, complete stenographic records of
4  interviews of hypnotized persons who later testify should be
   maintained.  Only the judge, jury, and the opponent know who was
5  present, questions that were asked, and the witnesses's responses can
   the matter be dealt with effectively.  An audio or video recording of
6  the interview would be helpful.

7  *Adams*, 581 F.2d at 198.  Nine years after this ruling in *Adams*, the

8  Supreme Court in *Rock,* while deeming unconstitutional Arkansas's per se

9  prohibition of a criminal defendant's hypnotically-refreshed testimony,

10 also suggested the use of procedural safeguards to reduce the

11 inaccuracies that hypnosis induces.  *Rock*, 483 U.S. at 60-61 (suggesting

12 that hypnosis be performed by a psychologist or psychiatrist; that such

13 person have special training and be independent of the investigation;

14 that the hypnosis occur in a neutral setting; and that no one be present

15 except the subject and the hypnotist).  Most recently, the Ninth Circuit

16 confirmed that the only procedural requirement in this circuit is that

17 "a complete stenographic record of the hypnosis interview be....properly

18 recorded and maintained..." *Mancuso v. Olivarez*,  292 F.3d 939 (9th Cir.

19 2002).

20     The underlying concern giving rise to the Ninth Circuit's sole

21 procedural requirement was the risk of suggestion.  Though expressed in

22 the criminal context, this concern and the desire to minimize suggestion

23 to produce reliable testimony is every bit as present in the civil

24 context.  In this case, the plaintiffs produced the handwritten notes of

25 the hypnotist, a largely inaudible videotape of the hypnotic session, and

26 an enhanced CD of the audio version of the session, which also is

undisputedly at times also inaudible.   After the Court's ruling that plaintiffs' submissions did not meet the procedural requirement of a "complete stenographic record," plaintiffs submitted as part of their motion for reconsideration a typed transcript of the audible portions prepared by plaintiffs' counsel's secretary.   Plaintiffs criticize this Court for not having advised counsel before oral argument of the difficulty with the audio.   *Plaintiffs Reply Memo to Boeing* at 6.

It would be improper for this Court to advise counsel at any time of the measures he should take to oppose defendants' motions for summary judgment.   The difficulty with the audio of the hypnosis sessions (notably discussed in pleadings submitted months prior to the hearing) was not just "the Court's problem," *Plaintiffs' Reply Memo to Boeing's Opposition at 5*, but also by admission, plaintiffs' counsel's problem, opposing counsel's problem, and their hired expert's problem.   Suggestion by a hypnotist can be wholly intended or unintended; verbal or nonverbal. The purpose of a complete stenographic record is clearly to enable a judge, other interested parties, and a jury, the ability to critically and efficiently analyze the session to gauge the reliability of *the manner in which the hypnosis session itself was conducted*.

The transcript prepared by plaintiffs is helpful (though rightfully challenged), and could and should have been produced initially along with the non-stenographic inaudible recording.   Though there remains a question as to whether the information contained therein is "complete," a strict reading of this procedural rule could bar the admissibility of testimony that is reliable, despite some departures from ideal procedures, or as in this case, a technical mishap.   Thus, the Court

1    recognizes that plaintiffs have now at least substantially complied.

2        The Court does not view the plaintiffs' compliance with the Ninth

3    Circuit's minimal procedural standard as a "red herring" issue in this

4    case as suggested by plaintiffs.  It is an important threshold issue in

5    any case involving hypnotically refreshed testimony.  At the same time,

6    the Court agrees with plaintiffs that the greatest concern in this case

7    is not the procedures employed by Dr. McKnight during the hypnotic

8    sessions (though suggestion, such as the use of leading questions, is an

9    inherent concern of hypnosis).[5]  Rather, the Court's far greater concern

10   involving these facts is the high likelihood of confabulation. The Ninth

11   Circuit's procedural safeguard no matter how technically complied with

12   cannot bring about reliable testimony. For this reason, the Court did not

13   accept plaintiffs' suggestion to continue the summary judgment hearing

14   to have a transcript prepared.  It is also why the Court did not and does

15   not rest its ruling solely upon the above technical rule.

16       The Ninth Circuit authority on point does not deprive this Court of

17   its wide discretion in determining admissibility, its gatekeeper

18   function, and its duty to enforce the Federal Rules of Evidence.  In

19   fact, it has reaffirmed the trial court's duty, as a gatekeeper, to

20   protect against "against the dangerous potential for abuse" and to ensure

21   the "the statements after hypnosis are the product of the subject's own

22   recollections."  *See U.S. v. Adams*, 581 F.2d 193, 193 (1978).

23       The Court's evaluation accordingly also considers these very basic

24   evidentiary precepts: first, the principle embodied in Federal Rule of

25   ─────────────────

26       [5]  Perhaps this is at least in part due to the poor audio quality of
     the recording (*see Elizabeth Loftus Declaration*) and the plaintiffs'
     failure to produce a stenographic record until now.

Evidence 402 that "all relevant evidence is admissible"; second, under
Rule 601, the principle that "every person is competent to be a witness,"
subject to only certain explicit exceptions; the jurisprudential rule
that, in determining admissibility, the trial judge's discretion is wide;
and finally, the limiting rule that even relevant evidence may be
excluded if its probative value is substantially outweighed by such
factors as the "danger of unfair prejudice, confusion of the issues, or
misleading the jury [or trier of fact]."  Fed. R. Evid. 403.

The circumstances leading to the hypnotic session are most notable.
Mr. Palmquist is not only a witness, but a litigant in this case.  This
lawsuit was filed prior to his hypnosis based upon the theory that a C-17
was the cause of the Piper's crash - - a theory which Mr. Palmquist had
devised and become convinced of himself after researching the internet
and speaking with the deceased pilot's family.  At the time of this
tragic accident, Mr. Palmquist lived and worked on the Sheffels ranch and
remained associated therewith following the accident. To this day, he
considers himself very close to Sheffels family.  The survival of this
lawsuit hinges on the plaintiffs ability to prove a C-17 was the cause
of the accident. Mr. Palmquist willingly submitted to hypnosis at the
request of his attorney for the specific purpose of this litigation and
facilitating his memory of the crash. Mr. Palmquist's pre-hypnotic
testimony is not consistent with his post-hypnotic testimony. For three
years, Mr. Palmquist could recall nothing about the airplane crash.  Mr.
Palmquist's post-hypnotic testimony is not corroborated by any other
circumstantial evidence of record.

Given all of these facts, this Court can not ignore the dangerous

ORDER - 13

potential for misuse Mr. Palmquist's hypnotically-enhanced testimony
carries. Given his beliefs and theories, Mr. Palmquist had multiple
reasons (with or without intending to do so) to confabulate under
hypnosis. There is also significant risk that Mr. Palmquist's post-
hypnotic testimony is the product of post-event suggestion. *See
generally, Declaration of Elizabeth Loftus*. Mr. Palmquist further
testified during his deposition that he believed a person could not lie
under hypnosis. As agreed upon by both plaintiffs' and defendants'
experts, and as commented by the Court in *Rock v. Arkansas*, the "popular
belief that hypnosis guarantees the accuracy of recall is as of yet
without established foundation, and, in fact, hypnosis often has no
effect at all on memory." *Rock*, 483 U.S. 44, 59 (1987). Dr. McKnight,
plaintiffs' hypnotist, also asserts that refreshed memories are subject
to the risk of external factors, including fabrication, and "no expert
can provide an opinion based upon reasonable psychological probability
that the memories of Mike Palmquist of the subject incident with the C-17
are totally accurate or not." *Declaration of McKnight*, January 26, 2005.
These views cannot easily be discounted.

The foregoing facts are directly analogous to the facts of *Mersch v.
City of Dallas, Tex.*, 207 F.3d 732 (5th Cir. 2000). In *Mersch*, the civil
rights plaintiff, arrested for public intoxication, had a pre-hypnosis
suspicion, though no direct evidence, that during her arrest the
defendant police officers had assaulted her and caused her injuries.
After two hypnotic sessions suggested by her attorney, she was able to
"remember" the assault in detail. The circuit court determined this
evidence was inadmissible as it fell into the *one* circumstance in which

the Fifth Circuit had ruled hypnotically enhanced testimony is *per se* inadmissible, no matter what procedural safeguards are used in an attempt to "sanitize the hypnotic session": when the hypnotized subject identifies for first time a person he has reason to know is already under suspicion. *Id*.

The same conclusion must be reached here. Prior to hypnosis, Mr. Palmquist had a suspicion, but no direct evidence, to substantiate his suspicion that a C-17 caused the Piper to crash.  Mr. Palmquist's uncorroborated post-hypnotic version of the crash is so inherently untrustworthy and so highly likely the result of post-event suggestion or confabulation, it must be excluded. The testimony is so unreliable it can not be the basis upon which to grant summary judgment or create a genuine issue of material fact. *See Patelco Credit Union v. Sahni*, 262 F.3d 897 (9th Cir. 2001) (exclusion of unreliable testimony was not an abuse of discretion on summary judgment).

Finally, defendants have urged the Court to view this issue as an issue of witness competence and in the alternative exclude Mr. Palmquists' post-hypnotic testimony based upon Fed.R.Evid. 601,[6] which defendants' argue directs the application of state law in this case. Defendants imply that Mr. Palmquist has been rendered incompetent to testify as he is unable to know what the truth is.  At the hearing, the Court discussed this alternative theory and noted that the Ninth Circuit cases have not discussed Fed.R. Evid. 601 in this context.  The common

---

[6] Rule 601 provides: "Every person is competent to be a witness except as otherwise provided in these rules.  However, in civil actions and proceedings, with respect to an element of a claim or defense as to which State law supplies the rule of decision, the competency of a witness shall be determined in accordance with State law."

ORDER - 15

position taken in jurisdictions favoring the competency approach is that the possible distorting effects of hypnosis on memory are impossible to circumvent and are so substantial that "the game is not worth the candle." *People v. Shirley*, 181 Cal.Rptr. 243, 256, 723 P.2d at 1366, 1384 cert. denied, 459 U.S. 860, 103 S.Ct. 133, 74 L.Ed.2d 114 (1982); *see also People v. Zayas*, 131 Ill.2d 284, 137 Ill.Dec. 568, 546 N.E.2d 513, 515-16 (1989).

The law is in this area is in a state of flux and "none of the different positions adopted by the various courts which have decided this issue are without practical, conceptual, and legal incongruities." *State v. Brown*, 337 N.W.2d 138, 148 (N.D. 1983).  However, no federal decision in this area has ever used Rule 601 as a basis for decision.  In fact, the Ninth Circuit has squarely held that the use of hypnosis to refresh recollection does not present an issue of witness competency. *Kline* v. *Ford Motor Co., Inc.*, 523 F.2d 1067, 1069-70 (9th Cir. 1975). Accordingly, the Court's final ruling, expressed herein, does not rest alternatively on competency and Rule 601.

## III. PLAINTIFFS' COUNSEL'S ILLUSTRATIVE AID

Plaintiffs also request this Court to reconsider its ruling refusing to consider the illustrative aid sought to be used by plaintiffs counsel during argument on the cross-motions for summary judgment, arguing the Court was deprived of a meaningful visual presentation of evidence. The visual aid is a map, prepared by plaintiffs counsel, which counsel contends reflects an accurate consolidation of several maps, Exhibit 1 used at the deposition of Mr. Laughbon and Exhibit 3 used at the deposition of Mr. Dreger.  At the time of the hearing, the United States

1  opposed counsel's use of this aid, contending that it was not accurate

2  and was misleading, but did not object to use of the deposition exhibits

3  which the Court in fact considered.

4      Trial courts have discretionary authority to permit counsel to employ

5  illustrative aids to clarify complex testimony or other information.

6  This type of summary is an *aid*, not an exhibit, and is more akin to

7  argument than evidence since it organizes documents already admitted in

8  evidence.   Plaintiffs' counsel took a calculated risk bringing an

9  illustrative aid of his own creation, which opposing counsel had not

10 approved prior to the hearing, nor even seen prior to the hearing. Due

11 to the contention over the accuracy of counsel's creation, the Court,

12 with a keen interest in moving on to the merits of the case, rightly

13 refused to allow counsel to utilize the aid.  All parties were able to

14 argue their case using the evidence of record, including the maps and

15 exhibits actually utilized by the witnesses during their depositions.

16 The lack of the aid in no way denied counsel the opportunity to argue

17 that the Mr. Laughbon and Mr. Dreger's deposition testimony was

18 consistent regarding the location of the C-17.  The Court's refusal to

19 permit counsel to utilize his illustrative aid provides no basis to alter

20 or amend the Court's ruling.

21 **IV. SUMMARY**

22     Plaintiffs offer no reason for this Court to reconsider its previous

23 oral ruling.  In summary, the Court finds the post-hypnotic testimony of

24 Michael Palmquist is inadmissible.  Those portions of the Declarations

25 of Jerry Wells, Richard Wood, and Donald Kennedy which rely upon this

26

ORDER - 17

1    inadmissible evidence are also stricken.[7]    On the parties cross-motions

2    for summary judgment, where there is insufficient evidence of causation,

3    summary judgment is appropriate.    "The trier of fact is not permitted to

4    resort to speculation and surmise." *Nat'l Inuds., Inc. v. Republic Nat'l*

5    *Life Ins., Co.*, 677 F.2d 1258, 1267 (9th Cir. 1982).    "The burden of

6    proving proximate is not sustained unless the proof is sufficiently

7    strong to remove the issue from the realm of speculation by establishing

8    facts affording a logical basis for all inferences necessary to support

9    it..."    *Gardner v. Seymour*, 27 Wn.2d 802, 809, 180 P.2d 564 (1947).

10   Viewing the evidence in the light most favorable to plaintiffs, the

11   evidence presented is entirely too speculative to establish causation.

12   Assuming the witness-observed C-17 testimony to be true, it remains

13   insufficient to establish a genuine issue of material fact that a C-17

14   was a proximate cause of the Piper aircraft crash.    Accordingly,

15   defendants' motions for summary judgment are granted.

16   **V. CONCLUSION**

17       Based upon the reasons and authorities cited above, the Court **ORDERS**

18   as follows:

19       1. Plaintiffs' Motion for Partial Summary Judgment (Ct. Rec. 127) is

20   **DENIED.**

21       2. Defendants' Joint Motion to Strike Michael Palmquist's Post-

22   Hypnosis Account (Ct. Rec. 162) is **GRANTED.**

23       3. Defendants' Joint Motion to Strike Declarations of Jerry Wells and

24   Richard Wood (Ct. Rec. 166) is **GRANTED.**

25

26       [7]   Wood Declaration, pg 3 lines 11-17, pg 6, lines 16-20; Wells
     Declaration pg 3 lines 15-20, pg 4 lines 5-10; Kennedy Declaration ¶¶ 6-
     7.

1    4. Defendant The Boeing Company's Motion for Summary Judgment (Ct.

2  Rec. 169) is **GRANTED**.

3    5. Defendant USA's Motion for Summary Judgment (Ct. Rec. 174) is

4  **GRANTED**.

5    6. The Boeing Company's Motion to Strike the Declaration of Donald

6  Kennedy (Ct. Rec. 237) is **GRANTED**.

7    7. USA's Motion to Strike the Declaration of Donald Kennedy (Ct. Rec.

8  246) is **GRANTED**.

9    8. Plaintiffs' Motion for Reconsideration (Ct. Rec. 250) is **DENIED**.

10    9. The District Court Executive is directed to ENTER THIS ORDER, ENTER

11  JUDGMENT in favor of the defendants, and CLOSE THE FILE.

12    **IT IS SO ORDERED**.  The Clerk of the Court shall forward copies of this

13  order to counsel for plaintiffs, counsel for defendants, and to Hon.

14  Phillip W. Borst, guardian ad litem.

15    **DATED** this 13th day of June, 2005.

16

17                    *s/Lonny R. Suko*
                    _____
18                        LONNY R. SUKO
                    UNITED STATES DISTRICT JUDGE

19

20

21

22

23

24

25

26

ORDER - 19